UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
FAR EASTERN SHIPPING CO.,

                              Plaintiff,

          - against -

PROGRESS BULK CARRIERS, LTD.,

                            Defendant.
------------------------------------------------------------------------X

**ECF CASE**

07 Civ. 11375 (PAC)

## AFFIRMATION OF IBRAHIM MAZMAN IN SUPPORT OF MOTION TO VACATE ATTACHMENT

       IBRAHIM MAZMAN, affirms and states the following under the penalties of perjury under 28 USC § 1746:

       1.     I am President of Med Brokerage and Management, Corp. ("MED") and make this Affirmation on behalf of and at the request of Progress Bulk Carriers, Ltd. ("PBC"), in support of PBC's motion to vacate the attachment.

       2.     MED is a New York domestic business corporation (registered since December 9, 1997) and maintains offices at 29 Continental Place in Glen Cove, NY 11542 and 29 Broadway in New York, NY 10006.  (See NYS Department of State, Division of Corporations print-out dated January 18, 2008, a copy of which is annexed hereto as Exhibit A).

       3.     On January 20, 1998, PBC entered into an agreement with MED, providing that MED would act as PBC's worldwide managing agent (the "Agency Agreement").  (A copy of the Agency Agreement is annexed hereto as Exhibit B).

       4.     Specifically, the Agency Agreement provided that PBC "engages Med to perform certain worldwide shipping business functions and services" including (a) negotiation and conclusion of agreements to obtain, lease and/or charter vessels, (b) negotiation and

purchase of supplies and/or services such as crews, fuel, port fees, tugs, dunnage, maintenance and repair, (c) furnishing of vessel support services such as marketing and sales, booking of cargo, issuing of bills of lading, receiving freight payments, collection, claims handling, voyage accounting, paying suppliers, (d) and the provision of other services reasonably requested by PBC such as insurance procurement, participation in dispute resolution, *etc.*  (See Exhibit B at pp. 1-2).

5.    Thus, under the Agency Agreement, MED manages the day-to-day operation of PBC's fleet of vessels.  Substantially all of the activities involved in managing PBC's worldwide shipping business are performed exclusively by MED at our offices in New York and have been performed by MED since 1998.  From 2002 to the present, MED has negotiated and managed approximately 700 charters on behalf of PBC.

6.    I have been informed by counsel for PBC that this lawsuit relates to a dispute over PBC's time charter of the M/V CHERKASSY (the "Vessel") from Far Eastern Shipping Co. ("FESCO").

7.    On October 22, 2002, by an amended New York Produce Exchange form time charter (the "Charter Party"), PBC chartered the Vessel from FESCO for a period of eight months plus or minus fifteen days at PBC's option.  (A copy of the Charter Party is annexed hereto as Exhibit C).

8.    MED was the managing agent for PBC and of the Vessel, when it was chartered from FESCO.  Moreover, I was President of MED during the negotiation of the Charter Party.  Thus, I am fully familiar with the Charter Party, with the facts underlying the dispute between PBC and FESCO, and with the Rule B attachment action filed by FESCO that is now before this Court.

9.     The Charter Party was negotiated in New York and the broker involved on behalf of PBC was Ekko Chartering LLC, a New York domestic business corporation with an office located within the Southern District of New York ("SDNY") at 1 Bridge Street, Suite 64, Irvington, New York 10533.  (See the stamp on the first page of Exhibit C).

10.     As I previously stated, the Charter Party was entered into on behalf of PBC by MED.  (See Exhibit C at p. 5).  Moreover, Clause 5 of the Charter Party provided that "[p]ayment of said hire to be made in New York…."  (See Exhibit C at p. 2).

11.     Thus, the Charter Party was negotiated in New York by PBC's New York based managing agent, with the assistance of PBC's New York based chartering broker, and called for hire payments to be made in New York.

12.     Aside from the Charter Party, PBC via MED has a number of other connections with New York and with the SDNY in particular.

13.     PBC via MED regularly and routinely purchases bunkers (fuel) from Bunkers LLC, a bunker trader/broker with an office at 29 Broad Street, New York, NY 10004.  I would estimate that PBC has purchased bunkers from Bunker LLC approximately 35 times a year for the past 5 years.

14.     PBC via MED also regularly deals with the following chartering brokers in New York: Stewart Alexander & Co., Seven Penn Plaza, Suite 1110, New York, NY 10001 and Ekko Chartering LLC, 1 Bridge Street, Suite 64, Irvington, NY 10533.  Of the approximately 700 charters entered into by PBC since 2002, I would estimate that about 63 of these charters were brokered by Stewart Alexander & Co. and Ekko Chartering LLC.

15.     In fact, as noted above, Ekko Charterering LLC was the chartering broker who assisted PBC in fixing the Charter Party involved in this lawsuit.

16.     Further PBC's insurance broker via MED is the Marine & Energy Department of Marsh ("Marsh"), who is located at 1166 Avenue of the Americas, New York, NY 10036.  Marsh has placed P&I and other insurance risks for PBC since 2004.

17.     Additionally, a number of PBC's chartering clients are located in the SDNY, such as:

(a)     Mac Steel Corp., located at 105 Corporate Park Drive, White Plains, NY 10604 (10-20 charters);

(b)     Mitsui & Co. (U.S.A.), Inc., 200 Park Avenue, New York, NY 10166 (4-5 charters);

(c)     Sojitz Corporation of America, 1211 Avenue of the Americas, 44th Floor, New York, NY (2 charters);

(d)     ED&F Man Sugar, Inc., 1 World Financial Center, 200 Liberty Street, 22nd Floor, New York, NY 10281 (4-5 charters); and

(e)     Hugo Neu Corporation, 120 Fifth Avenue, Suite 600, New York, NY 10011 (4-5 charters).

18.     Moreover, from 1998 up until February 2007, PBC was a member of the American Steamship Owners Mutual Protection and Indemnity Association, Inc. (the "American Club"), located in the SDNY, and all of PBC's chartered vessels were covered by American Club for charterers' liability.

19.     PBC has also been involved both as plaintiff and defendant in a number of lawsuits in the SDNY including:

(a)     Thyssen, Inc. v. M/V Ceren Urkmez and Progress Bulk Carrier Ltd. et al., 99 Civ. 12406 (LLS);

–4–

(b)  Mitsui Marine & Fire v. M/V "Orcun C" and Progress Bulk Carriers, Ltd. et al., 01 Civ. 5580 (LAK);

(c)  Macsteel Int'l U.S.A v. M/V Handy Silver and Progress Bulk Carrier Ltd. et al., 03 Civ. 8663 (KMW);

(d)  MacSteel International USA Corp. v. M/V Ain Oussera and Progress Bulk Carriers Ltd. et al., 04 Civ. 0434 (RJH);

(e)  Dicalite Armenia, Inc. v. Progress Bulk Carriers, Ltd., 04 Civ. 9241 (RCC);

(f)  Progress Bulk Carriers Ltd. v. Daeshin Shipping Co. Ltd., 05 Civ. 6930 (DC);

(g)  Man Ferrostaal, Inc. v. M/V "Lokris" and Progress Bulk Carriers, Ltd. et al., 05 Civ. 9138 (DC);

(h)  Progress Bulk Carriers Ltd. v. Ercan Denizcilik Limited Sirketi, 06 Civ. 0823 (GBD);

(i)  Progress Bulk Carriers Ltd. v. SNTM Cnan, 07 Civ. 0155 (PKL); and

(j)  Dicalite Armenia, Inc. v. Progress Bulk Carriers Ltd., 07 Civ. 8660 (WHP).

In those lawsuits in the SDNY in which PBC has been a defendant, PBC has not contested personal jurisdiction.

20.    Additionally, from time to time MED employees, on behalf of PBC, meet with prospective clients and attend promotional or marketing events in Manhattan approximately 4 times a year.

21.     Finally, MED is authorized to accept service of process on behalf of PBC, and has accepted such service on a number of occasions.  Specifically, on October 9, 2007, Arif Ors, a manager employed by MED, accepted service of process at MED's Glen Cove office in connection with the lawsuit bearing the caption <u>Dicalite Armenia, Inc. v. Progress Bulk Carriers, Ltd.,</u> 07 Civ. 8660 (WHP), USDC, SDNY.  (See Affidavit of Service, a copy of which is annexed hereto as Exhibit D).

The foregoing is true and correct to the best of my knowledge under the penalty of perjury.

Executed on:   January 22, 2008

_____
Ibrahim Mazman

## CERTIFICATE OF SERVICE

Kirk M. Lyons, an attorney duly admitted to practice before this Honorable Court, affirms on this 24th day of January 2008, I served true copies of the foregoing, by e-mail and ECF notice to:

LAW OFFICES OF SIMON HARTER, ESQ.
Attorneys for Plaintiff
304 Park Avenue South, 11th Floor
New York, NY 10010

Attn.:  Simon Harter, Esq.
        sharter@harterlaw.com

Kirk M. Lyons

U:\kmhldocs\2656001\Motions\Aff-IM-Vacate.doc

# EXHIBIT A

# NYS Department of State

## Division of Corporations

## Entity Information

---

Selected Entity Name: MED BROKERAGE & MANAGEMENT CORP.

Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | MED BROKERAGE & MANAGEMENT CORP. |
| **Initial DOS Filing Date:** | DECEMBER 09, 1997 |
| **County:** | NEW YORK |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC BUSINESS CORPORATION |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**

MED BROKERAGE & MANAGEMENT CORP.
29 BROADWAY STE 1602
NEW YORK, NEW YORK, 10006-3201

**Chairman or Chief Executive Officer**

IBRIHIM MAZMAN
MED BROKERAGE MANGAMENT CORP
29 BROADWAY STE 1602
NEW YORK, NEW YORK, 10006-3201

**Principal Executive Office**

MED BROKERAGE & MANAGEMENT CORP.
29 BROADWAY STE 1602
NEW YORK, NEW YORK, 10006-3201

**Registered Agent**

NONE

NOTE: New York State does not issue organizational identification numbers.

Search Results                    New Search

Division of Corporations, State Records and UCC Home Page    NYS Department of State Home Page

# EXHIBIT B

# <u>AGREEMENT</u>

This is an Agreement between Progress Bulk Carriers Ltd., a Bahamas corporation (hereinafter 'Progress' or 'the Principal'), and Med Brokerage & Management Corp., a New York corporation (hereinafter 'Med' or 'the Agent').

      WHEREAS Progress is a principal engaged in a worldwide shipping business and is desirous of having an agent manage its affairs, and

      WHEREAS Med is both capable and desirous of acting as an agent and performing the functions and services for a worldwide shipping business, and

      WHEREAS Progress is willing to engage Med to perform said worldwide shipping business services, and Med is desirous of accepting said appointment,

      NOW, THEREFORE, Progress and Med agree to enter into a binding contract, whereby Progress engages Med to perform certain worldwide shipping business functions and services for appropriate compensation under the following terms and conditions:

      1. <u>DUTIES OF AGENT:</u> The management by Med of the worldwide shipping business of Progress shall include, but not be limited to, the following functions and services:

            (a) Negotiate and conclude agreements to obtain, lease, and/or charter ships on behalf of Progress,

            (b) Negotiate and purchase supplies and/or services needed for successful dispatch of the interests of Progress with respect to obtaining, leasing, and/or chartering of vessels, including,

1

but not limited to, maintenance and repair of said vessel(s), fuels and/or supplies for the vessel(s) and crew, seaway and port fees and/or charges, and all other attendant services, such as tugs, longshore gangs, dunnage, etc., which are necessary for a successful maritime undertaking,

(c) Furnish ship support services, including, but not limited to, marketing and sales, booking cargo, issuing Bills of Lading, receiving freight payments, undertaking collection efforts, handling claims, paying suppliers, and preparing voyage accounting functions,

(d) Provide other services which the Principal may reasonably request, including related matters, including, but not limited to, procuring insurance, obtaining professional services (surveyors, accountants, attorneys, etc.), and participating in dispute resolution with clients.

2. <u>COMPENSATION OF AGENT:</u> The compensation of the Agent is set forth in 'Appendix A'; said compensation can be changed from time to time by executing a subsequent Appendix, which must be dated and signed by both parties, and must acknowledge that it is a substitution for the previous compensation arrangement.

3. <u>BEST EFFORTS:</u> The Agent will act in the best interests of the Principal in matters relating to this Agreement. The Principal agrees to indemnify and hold harmless the Agent for all actions and omissions undertaken on the Principal's behalf, so long as the Agent was acting in good faith, and did not engage in willful misconduct and/or gross negligence.

4. <u>DURATION OF AGREEMENT:</u> This Agreement shall be valid from the date of signature for a period of one year, and shall automatically and successively be renewed for an additional year, unless one party notifies the other in writing at least ninety days in advance of its desire to terminate the Agreement at the end of then current year.

5. <u>CHOICE OF LAW:</u> This Agreement shall be governed by the laws of the State of New York, without giving effect to conflicts of laws principles.

6. <u>ARBITRATION:</u> Should the parties have a dispute which they cannot resolve between themselves, said dispute shall be submitted to a single arbitrator in New York, N Y, to be resolved under the then current rules of the American Arbitration Association.

Dated at New York, NY, this 20th day of January, 1998,

For and on behalf of:

Progress Bulk Carriers Ltd.

Sevim Numanoglu

For and on behalf of:

Med Brokerage and Management Corp.

MED BROKERAGE & MANAGEMENT
29 CONTINENTAL PLACE
GLEN COVE, NY 11542
(516) 671-4454

Ibrahim Mazman

# APPENDIX 'A'

## Terms of Compensation

1. <u>COMMISSION:</u> Med shall be entitled to a commission of 2 1/2 % of all billings to clients, said commission to be deducted from remittances to the Progress's account.

2. <u>ALLOWABLE EXPENSES:</u> Med shall be entitled to also deduct all shipping related expenses and incidental costs incurred on behalf of Progress, including, but not limited to, all voyage related expenses, communications, travel expenses to visit ports, clients, etc.

3. <u>NON-ALLOWABLE EXPENSES:</u> Med may not deduct expenses, relating to its own business, including, but not limited to office rent and utilities, employees' salary and benefits, and any expenses not incurred on behalf of Progress.

EXHIBIT C



**EKKO CHARTERING LLC**
1 Bridge Street
Suite 64
Irvington, NY 10533

# Time Charter

### Government Form
### Approved by the New York Produce Exchange
### November 6th, 1913-Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

ORIGINAL

1  *This Charter Party*, made and concluded in ___New York___ 22ⁿᵈ day of ___October___ ~~19~~ 2002

2  Between ___FAR EASTERN SHIPPING CO., Vladivostok, Russia___

3  Owners of the good ___Russian flag___ {~~steamship~~/Motorship} **"CHERKASSY"** See Clause 53 of _____

4  of _____ tons gross register, and _____ tons net register, having engines of _____ indicated horse power

5  and with hull, *cargo space*, machinery and equipment in a thoroughly efficient state, *appearance* and classed ___RS KM L3 by Russian Maritime

6  Register of Shipping___

7  at _____ of about _____ cubic feet bale capacity *available for cargo*, and about _____ tons of ~~2240 lbs.~~

8  deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,

9  allowing a minimum of fifty tons) on a draft of _____ ~~feet~~ _____ ~~inches on~~ _____ Summer freeboard, inclusive of permanent bunkers,

10  which are of the capacity of about ___ tons of fuel, and capable of steaming *throughout the entire period of the Charter Party*, fully laden, under good weather

11  conditions about _____ knots on a consumption of about _____ tons of the best Welsh coal-best grade fuel oil-best grade Diesel oil,

12  now ___en route to Taichung___

13  _____ and ___MESSRS. PROGRESS BULK CARRIERS LTD.___ Charterers of the City of ___Bahamas___

14  *Witnesseth,* That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

15  about ___timecharter period for about 8/12 months +/- 15 days in Charterers' option___

16  _____ within below mentioned trading limits.

17  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

18  the fulfilment of this Charter Party.

19  Vessel to be placed at the disposal of the Charterers, ~~at~~ ___arrival pilot station XINGANG or equal distance___

20  ___any direction of TAICHUNG in Charterers' option___

21  ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all time of tide, except as otherwise provided in clause No.6), as~~

22  ~~the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5.~~ Vessel on her delivery to be

23  ready *and fit in every way to receive and carry any permissible cargo and to be maintained in such condition during the entire period of this Charter* to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted for service, having water ballast, *cranes winches* and

24  donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the *cranes* ~~winches~~ at one and the same

25  time (and with full complement of officers, seamen, engineers and firemen for vessel of her tonnage), to be employed, in carrying lawful merchan-

26  dise, including petroleum or its products, in proper containers, excluding ___See Clause 38___

27  (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their own risk,

28  all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports ~~in British North~~

29  ~~America, and/or Unites States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~

30  ~~Mexico, and/or South America~~ _____ and/or Europe

31  and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between

32  October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,

ORIGINAL

32   *Worldwide trade within IWL always afloat always accessible excluding (See Clause*
33   *37)*

35   as the Charterers or their Agents shall direct, on the following conditions:
36       1.  That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees **including agency fees** of the Crew; shall pay for the
37   insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep
38   the vessel in a thoroughly efficient state in hull, **cargo spaces**, machinery and equipment for and during the service.
39       2.  That **whilst on hire** the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, **compulsory** Pilotages, Agencies, Commissions,
40   Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into
41   a port for causes **or cargoes carried prior to delivery** for which vessel is responsible, then all such charges incurred shall be paid by the Owners.  Fumigations ordered because of
42   illness of the crew to be for Owners account.  Fumigation ordered because of cargoes carried or ports visited while vessel is employed under this
43   charter to be for Charterers account.  ~~All other fumigations to be for Charterers account after vessel has been on charter for a continuous period~~
44   ~~of six months or more.~~
45       Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
46   Owners to allow them the use of any dunnage and shifting boards already aboard vessel.  Charterers to have the privilege of using shifting boards
47   for dunnage, they making good any damage thereto.
48       3.  That the Charterers, at the port of delivery, and the Owners, **upon** ~~at the port of~~ re-delivery, shall take over and pay for all fuel remaining on
49   board the vessel **as per Clause 39** ~~at the current prices in the respective ports, the vessel to be delivered with not less than~~ ——————————— tons and ~~not more than~~
50   ——————————— ~~tons and to be re-delivered with not less than~~ ——————— ~~tons and not more than~~ ——— ~~tons.~~
51       4.  That the Charterers shall pay for the use and hire of the said Vessel at the rate of  *U.S $4,550.00 per day pro rata*
52   *including overtime for first 50 days - U.S. $5,050.00 per day pro rata including*
    *overtime for the balance* ~~United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and~~
53   ~~stores, on~~ ——————————— ~~summer freeboard, per Calendar Month,~~ commencing on and from the day of her delivery, as aforesaid, and at
54   and after the **said above rates** ~~same rate~~ for any part of a **day** ~~month;~~ hire to continue until the hour of the day of her re-delivery in like good order and condition ordinary
55   wear and tear excepted, to the Owners (unless lost) ~~at~~ *on dropping last outbound sea pilot / passing / safe port*
56   *anytime day/night Sundays and holidays included port in Charterers' option:*
    *Boston/Paramaribo range including North Coast South America, Carriban, U.S. Gulf or*
    *Vancouver BC/Balboa range or Baltic/Alexandria range including Black Sea/Adriatic or*
    *Singapore/Japan range including South Korea, Phillipines* unless otherwise mutually agreed.  Charterers are
  to give Owners not less than ___ 20 ___ days **approximate**
57   notice of **date/port of redelivery and not less than ten days approximate 7/5/3/2 and 24 hours notice** vessels expected date of re-delivery, and probable port.
58       5.  Payment of said hire to be made in New York in cash in United States Currency, ~~semi-monthly~~ **every 15 days** in advance and for the last half month or
59   part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60   due, if so required, by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
61   hire, **and bunkers on delivery** or bank guarantee, or on any **fundamental** breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62   terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers.  ~~Time to count from 7 a.m. on the working day~~
63   ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~

ORIGINAL

64  to have the privilege of using vessel at once, such time used to count as hire.

65  Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
66  to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
67  of such advances.

68  6.  That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place *in port or elsewhere* that Charterers or their Agents may
69  direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safely
70  lie ground.

71  7.  That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
72  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73  tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodations allow, Charterers
74  paying Owners _____ per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are
75  incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense.

76  8.  That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
77  boats.  The Captain (although appointed by the Owners) shall be under the orders and directions of the Charterers as regards employment and
78  agency; and Charterers are to load, stow, and trim, *lash, secure, dunnage and discharge* the cargo at their expense under the supervision *and responsibility* of
     the Captain, who is to sign Bills of Lading for
79  cargo as presented, in conformity with Mate's or Tally Clerk's receipts.

80  9.  That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81  receiving particulars of the complaint, investigate the same; and, if necessary, make a change in the appointments.

82  10.  That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
83  with the utmost despatch.  He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
84  rate of $1.00 *$10.00* per day.  Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally
85  Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal, for all such victualling. *Also see Clause 73.*

86  11.  That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88  terers, their Agents or Supercargo, when required, with a true copy of daily *deck and engine logs in Russian and extracts from logs translated in English*
     Logs, showing the course of the vessel and distance run and the con-
89  sumption of fuel.

90  12.  That the Captain shall use diligence in caring for the ventilation of the cargo.

91  13.  That the Charterers shall have the option of continuing this charter for a further period of _____
92  _____
93  on giving written notice thereof to the Owners or their Agents _____ days previous to the expiration of the first-named term, or any declared option.

94  14.  That if required by Charterers, time not to commence before  *October 25, 2002*  and should vessel
95  not have given written notice of readiness on or before  *November 10, 2002*  but not later than 4 p.m. Charterers or
96  their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

97  15.  That in the event of the loss of time from deficiency of men or *and/or default of men or deficiency of* stores, fire, breakdown or damages to hull,
     machinery or equipment,
98  grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause *whatsoever*
99  preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by
100  defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101  thereof, and all extra expenses shall be deducted from the hire.

102  16.  That should the vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103  returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104  Rivers, Machinery, Boilers, and Steam navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105  The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106  purpose of saving life and property.

107  17.  That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to *Arbitration as per Clause 48.* three

persons at New York,

108 ~~One to be appointed by each of the parties hereto, and the third by the two so chosen, their decision or that of any two of them, shall be final, and for~~
109 ~~the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.~~

110 18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-
111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113 might have priority over the title and interest of the owners in the vessel.

114 19. That all derelicts and salvage shall be for Owner's and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115 Crew's proportion. General Average shall be adjusted, stated and settled, according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive and Rule F of~~
116 York-Antwerp Rules ~~1924~~ **1974 in London, amended 1990, hire not to contribute to General Average**, at such port or place ~~in the United States~~ as may
be selected by the **Owners and Charterers to mutually agree,** Owners respecting **contract's stipulated as long as confined to London or another
recognized place of adjustment** ~~carrier~~, and as to matters not provided for by these
117 Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currency shall be exchanged into
118 United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at
119 the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or
120 bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier
121 or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if
122 required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the
123 carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the
124 place of adjustment in the name of the adjuster pending settlement of the General Average and redounds or credit balances, in any, shall be paid in
125 United States money. **See New Jason Clause, as attached.**

126 ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
127 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~
128 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
129 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
130 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
131 ~~ships belonged to strangers.~~
132 ~~Provisions as to General Average in accordance with the above are to be included in all Bills of Lading issued hereunder.~~

133 20. Fuel **and diesel oil** used by the vessel while off hire **to be for Owners' account.** ~~, also for cooking, condensing water, or for grates and stoves to~~
~~be agreed to as to quantity, and the~~
134 ~~cost of replacing same, to be allowed by Owners.~~

135 ~~21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
136 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~
137 ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~
138
139

140 22. Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to **maximum in accordance with
description clause** ~~three tons~~, also
141 providing ropes, falls, slings, and blocks. `If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for
142 same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel ~~lanterns and oil~~ **lights** for
143 night work, ~~and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense.~~ The
144 Charterers to have the use of any gear on board the vessel.

145 23. Vessel to work night and day, if required by Charterers, and all **cranes** ~~winches~~ to be at Charterers' disposal during loading and discharging;
146 steamer to provide one **craneman** ~~winchman~~ **or if required by Charterers watchmen or tallymen** per hatch to work winches day and night, as required;
~~Charterers agreeing to pay officers, engineers, winchmen,~~
147 ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates states in the ship's articles.~~ If the rules of the
148 port, or labour unions, prevent crew from driving **cranes** ~~winches~~, shore **Cranemen** ~~Winchmen~~ to be paid by Charterers. In the event of a disabled **crane or cranes**
~~winch or winches~~, or

ORIGINAL

149 insufficient power to operate ~~cranes winches~~, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned
150 thereby.

151 ~~24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~
152 ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,~~
153 ~~etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~
154 ~~of which are to be including in all bills of lading issued hereunder:~~

155 ~~U.S.A. Clause Paramount~~

156 ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
157 ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
158 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
159 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

160 **See New** Both-to-Blame Collision Clause, **as attached**.

161 If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the
162 Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried
163 hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss
164 or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-
165 carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other non-carrying ship or her
166 owners as part of their claim against the carrying ship or carrier.

167 25. ~~The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-~~
168 ~~drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the~~
169 ~~port or to get out after having completed loading or discharging.~~ **See Clause 37.**

170 26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171 navigation of the vessel, **acts of pilots and tugboats**, insurance, crew, and all other matters, same as when trading for their own account.

172 27. A commission of ~~2 ½~~ **3.75** per cent is payable by the Vessel and Owners to **POLARIS AGENCY LLC, SEATTLE for division including**
173 **1.25% to FESCO MANAGEMENT LTD.**
174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175 28. An address commission of ~~2 ½~~ **1.25** per cent payable to _____*Charterers*_____ on the hire earned and paid under this Charter.

**Additional Clauses, from no. 29 to no. 75, Chamber of Shipping War Risk Clauses 1 & 2, New Jason Clause, and New Both-to-Blame Collision Clause as attached herewith, to be deemed part of and incorporated to the present Charter Party.**

By cable authority from

The original Charter Party in our possession.      As _____     For Owners

BROKERS

For and on behalf of MED BROKERAGE & MANAGEMENT
As Agents Only     29 CONTINENTAL PLACE
GLEN COVE NY 11542
(516) 671-4454

This Charter Party is a computer generated copy of nype (revised 3rd October, 1946) form printed. It is precise copy of the original document typed on the computer which can be modified, amended or added to only by the striking out of the original characters, or insertion of new characters, such characters being clearly highlighted by underlining or use of color or use of different size font and marked as being amended as per the negotiations. E&OE

ORIGINAL

**RIDER TO**
**MV "CHERKASSY"**
EKKO CHARTERING LLC
**CHARTER PARTY DATED OCTOBER 22, 2002**

**CLAUSE 29:     NOTICES**
Owners to give Charterers notice on fixing and 10/7/5/3/2/1 days of
vessel's delivery.

**CLAUSE 30:**
Deleted.

**CLAUSE 31:     CERTIFICATES / VACCINATIONS**
Owners are obliged to deliver and keep the vessel, her crew and anything
pertaining hereto supplied with up-to-date and complete certificates,
approvals, equipment and fittings, enabling the vessel and her crew to
load, carry and discharge all cargoes permitted under this Charter Party,
and to receive bunkers within the trading limits of this Charter Party,
even where such certificates, approvals, equipment and fittings become
necessary before or after the commencement of this Charter Party.

It is the responsibility of the Master and the Owners to arrange for any
special vaccination required at ports of call and to keep on board
corresponding valid certificates.

If Owners fail to comply herewith, any time lost and all extra expenses to
be for Owners' account and Charterers may deduct same from the hire,
upon providing supporting documents or Owners will arrange
reimbursement to Charterers account against Charterers claim.

**CLAUSE 32:**
The Master shall supervise the stowage of the cargo thoroughly and let
one of his officers control all loading, handling, stowage and discharge of
the cargo and he is to furnish Charterers with stowage plans and other
documents as the case may be.

**CLAUSE 33:     ITF / FLAG RESTRICTIONS, ETC.**
Owners warrant that the officers and crew of the vessel are covered for
the duration of this Charter Party by an ITF Agreement or other bona fide
trade union agreement conforming to ITF standards acceptable
worldwide. Loss of time and extra expenses incurred as a result of non-
compliance shall be for Owners' account and may be deducted from hire.

The Owners are responsible for any loss of time or delay or restriction to
the full working of the vessel resulting from any action that may be taken
against the ship and/or the Owners by third parties for any reason

1

ORIGINAL

## RIDER TO
## MV "CHERKASSY"
## CHARTER PARTY DATED OCTOBER 22, 2002

# EKKO CHARTERING LLC

whatsoever unless attributable to action taken against the Charterers. Any time lost as a consequence of any such action by third parties shall be considered as off-hire and shall be deducted from the hire. Any extra expenses resulting directly or indirectly from such action shall be the sole responsibility of and paid for by the Owners or in Charterers' option shall be paid by the Charterers and deducted from the hire.

Owners' warrant that the vessel is not blacklisted by any country within the trading limits of this Charter Party.

## CLAUSE 34:       OIL POLLUTION

Owners warrant to provide for the vessel and maintain at their expense and carry on board the vessel a valid U.S. Coast Guard Certificate of Financial Responsibility as required under the U.S. Federal Water Quality Act and amendments thereto. Owners also warrant to have secured current certificates for other countries where similar guarantees are required. In no case shall the Charterers be liable for any damages as a result of the Owners' failure to obtain the aforementioned certificates or the Owners non-compliance with present or future water pollution legislation enacted by individual U.S. States or other countries. Time lost by non-compliance to be considered as off-hire and Owners to hold Charterers harmless against any consequential loss, damage or expense.

## CLAUSE 35:       P&I CLUB / CARGO CLAIMS

Owners guarantee that the vessel is entered and shall remain entered in a Protection and Indemnity Association for the duration of this Charter Party. Entry shall include, but not be limited to full cover for cargo claims of any nature.

Owners P&I Club          :       UK MUTUAL
Charterers' P&I Club     :       AMERICAN CLUB

Any liability to third parties for cargo claims shall be borne by Owners / Time Charterers in accordance with the Inter-Club NYPE Agreement as amended May 1984 and 1996 and any amendments hereto. The Party having paid the claim(s) shall submit same to the other party with supporting documents as soon as possible and neither party shall between themselves refer to the two (2) years time limit as defense.

## CLAUSE 36:       LIABILITY INSURANCE

The Charterers shall not be responsible for loss of life nor personal injury nor arrest or seizure or loss or damage to the vessel, her cargo subject to

2

ORIGINAL

**RIDER TO
MV "CHERKASSY"**          EKKO CHARTERING LLC
<u>**CHARTER PARTY DATED OCTOBER 22, 2002**</u>

Clause 35 and/or other objects arising from perils insured against by customary policies of insurance.

## CLAUSE 37:
## TRADING EXCLUSIONS / WAR RISK INSURANCE / ICE TRADING
Following countries/areas are always excluded from trading:

Worldwide trading within Institute Warranty Limits excluding CIS Pacific ports, Cuba, North Korea, Israel, Syria, Albania, Libya, Lebanon, Cambodia, Angola, Turkish Occupied Cyprus, Iraq, Former Yugoslavia / but vessel may trade through Croatia and Slovenia/, Somalia, Bangladesh, Nigeria, Liberia, Zaire, war or war like zones as declared by London underwriters.
Additional war risk insurance premium, crew bonus to be applicable only for trading into Persian Gulf or war zones, if any, if so declared by Lloyd underwriters in London, to be for Charterers' account.  The rate of premium not to exceed those quoted by Lloyd of London or underwriters.

List of trading exclusions to be revised when situation in excluded countries such that Owners are satisfied that exclusion is not warranted. Such revision to be mutually agreed between Owners/Charterers.

The Owners warrant that the vessel has not traded to North Vietnam since January 1st 1962.  The Owners further warrant that the vessel has not traded to Israel and that she is not Black Listed by the Arab Countries within the agreed trading limits.

Notwithstanding anything else contained in the Charter Party, the Owners agree that the vessel may trade any area which is now or which may be in the future designated by Lloyds and/or vessel's Hull Underwriters as a war zone and/or additional premium area, upon the following conditions:

a.)  The Owners warrant that the vessel shall remain insured throughout this Charter Party against war risks with the insurance company as stated in Description Clause.

b.)  The Charterers to reimburse Owners the amount of such war bonus as may be payable to the crew in accordance with the relevant collective agreement.

c.)  Basic war risk insurance premium to be for Owners' account.
Additional war risk premiums payable in respect of insurance covering physical loss of or damage to the vessel arising by reason

3

ORIGINAL

**RIDER TO**
**MV "CHERKASSY"**          EKKO CHARTERING LLC
**CHARTER PARTY DATED OCTOBER 22, 2002**

of the vessel trading under Charterers orders to war zone and/or additional premium area shall be for Charterers' account.  Any of

such additional premiums which is payable by the Charterers shall not exceed what would have been quoted or charged if the vessel was covered with Lloyds of London Underwriters.

d.)    In the event of the ship sustaining damage or being delayed, blocked or entrapped as a result of war risks in any area designated an "additional premium" area by London war risk underwriter.  Charterers shall not be deemed to have warranted the safety of any port or place in such area and in consideration of Charterers paying additional premium as above, Charterers shall be under no liability to indemnify Owners in respect of such damage.

With reference to © above, the Owners shall allow the Charterers to arrange these additional covers on their behalf if the Charterers so request and if the proposed insurer and terms must first be approved by the Owners.  If the Charterers arrange such insurance, the Charterers' insurers shall confirm cover latest 24 hours before the vessel is due to be exposed to the risk so insured.

Notwithstanding the contents of Clause 25, the Charterers are at liberty to send the vessel to port(s) and/or places where vessels of similar class and type navigate safely.  Vessel not to follow icebreaker and not to be obliged to force ice.

Charterers have the option to brake Institute Warranty Limits against paying the net extra insurance premium on hull and machinery as per receipted invoice from Owners underwriters subject to Owners approval but Owners approval not to be unreasonably withheld.

**CLAUSE 38:        CARGO EXCLUSIONS**
The following cargoes are excluded from carriage –

Livestock, pitch in bulk, sulphur, soda ash, Ferro silicon, nuclear isotopes, H.B.I., cement in bulk however cement in bags is allowed, all kind of acid any products associated with direct reduced iron, asphalt, arms and ammunitions, scrap, motor blocks and turnings, creosoted goods, petroleum or its products, petcoke, cakes, pyrites, calcium, hydroxide, nuclear materials, expellers, inflammable and dangerous goods, salt and mahogany logs, stone blocks, bagged rice, and any other harmful, dangerous, injurious, contraband or unlawful cargoes.
All cargoes to be loaded/carried and discharged always in accordance with IMO regulations and up to Master's satisfaction.

4

**RIDER TO
MV "CHERKASSY"**     EKKO CHARTERING LLC
**CHARTER PARTY DATED OCTOBER 22, 2002**

*ORIGINAL*

Charterers can carry ammonium nitrate of fertilizer grade only provided always excluding hold number 5 and not from/to Russian ports.

However Charterers can carry maximum 4 cargoes during duration of Charter Party: Clinker, scrap ex. MB&T, sulphur, petcoke (green petcoke excluded) with temperature less 55 degrees Celsius prior loading, salt.
For salt/sulphur – limewashing to be for Charterers' time and expenses.
For scrap softloading clause to apply.

Owners to do their utmost to arrange "supplement to the certificate of fitness of the ship for carriage of bulk cargo" within four months after the vessel has been delivered, or if this period is expired, than latest on arrival to Russian port for loading am nitrate.  Charterers agree to contribute U.S. $ 2000.00 payable as per Owners' instructions to cover the expenses for obtaining "supplement to the certificate of fitness of the ship for carriage of bulk cargo" from vessel's class.

**CLAUSE 39:     BUNKERS**
Charterers to redeliver with about the same quantities as actually on board on delivery.  Charterers to take over and pay with first hire value of bunkers and Charterers to have the right to deduct estimated bunker value on redelivery from last sufficient hire payment(s).  Bunker prices for delivery and redelivery to be the same both ends and based on Singapore prices of platts oligram on day of delivery or closest reporting day.  Charterers option to bunker prior to delivery provided same not interfering with Charterers cargo operations.  For the purpose of internal Fesco's ISM code procedure, Charterers have to advise to the Owners the agents and suppliers full style 3 (three) days before bunkering/supply of the vessel for Charterers' account.

Charterers nominate a surveyor for joint on-hire survey upon delivery or after arrival at first loadport after delivery and/or upon delivery or at last port before redelivery in order to establish bunker figures upon delivery, respectively, redelivery and such figure shall be final and binding upon both parties.
Cost and time for surveys to be split (50/50) between Owners and Charterers.

**CLAUSE 40:     WEATHER ROUTING**
The Charterers may supply an independent weather routing company's advice to the Master during voyages specified by he Charterers.  The Master shall comply with the reporting procedures of the routing service selected by the Charterers. Evidence of weather conditions shall be taken from the vessel's deck logs and the weather routing company's reports.

ORIGINAL

**RIDER TO**
**MV "CHERKASSY"**   EKKO CHARTERING LLC
**CHARTER PARTY DATED OCTOBER 22, 2002**

In the event of a consistent discrepancy between the deck logs and the weather routing company's reports the latter shall be taken as ruling.

**CLAUSE 41:    MASTERS/CREWS ASSISTANCE**

With reference to Clause 8 of this Charter Party, "customary assistance" shall mean all types of work which the Master and the Crew would normally do when the ship is trading for the Owners' account such as, but not limited to:

a)    All opening and closing of hatches, when and where required, if permitted by local regulations

b)    Deleted

c)    Lashing and/or unlashing of cargo, including containers, under and/or on deck.  Subject mutually acceptable rate to be agreed between Charterers and Master and provided such crew members are onboard with the necessary certification and qualification to undertake such work

d)    Warping alongside berths whenever required

The Master shall be responsible for all gear, equipment and/or stores supplied to the vessel by or for Charterers account and the Master shall keep a record of all such gear, equipment and/or stores so supplied. Master to maintain same in good condition.  Such gear, equipment and/or stores to be redelivered to the Charterers prior to redelivery of the vessel to the Owners or if required by the Charterers, at any time during the Charter in like good order and condition as supplied, fair wear and tear excepted.  The Owners shall make good any shortage and/or damage unaccounted for.

**CLAUSE 42:    BILLS OF LADING**

Congenbill(s) or other Bimco recognized/approved Bill(s) of Lading form to be used.  Bill(s) of Lading to be signed by Master or agents in accordance with the Charterers writing instructions, but always in accordance with Mate's Receipts.   Where it is customary in grain/agricultural products trading Mate's Receipt to be issued in accordance with elevators figure.

Fesco is not to be shown as a Carrier in the Bill(s) of Lading.  No liner/through Bill(s) of Lading will be issued during the currency of this Charter Party.

Charterers to indemnify Owners against any claims, or damages arising from Bill(s) of Lading not being in conformity with Mate's Receipt.

At discharging port, cargo to be released against original of respective Bills of Lading.  In case original Bill(s) of Lading are not arrived in time to

6

ORIGINAL

**RIDER TO**
**MV "CHERKASSY"**          EKKO CHARTERING LLC
**CHARTER PARTY DATED OCTOBER 22, 2002**

discharging port, Owners agree to discharge cargo as per Charterers' written instruction and against Letter of Indemnity as per Owners' P and

I Club wording issued/signed by Charterers on their letterhead. Before acceptance of such Letter of Indemnity Owners should have evidence that Bill(s) of Lading issued in accordance with this clause.

Charterers will keep Owners advised about actual arrival of Original Bill(s) of Lading to discharging port, and upon arrival of original Bill(s) of Lading same duly endorsed by receivers will be exchanged to the Charterers Letter of Indemnity.

**CLAUSE 43:**

The Charterers or their Supercargo(es) are entitled to call for speed trials, in ballast or loaded condition, indemnifying the Owners for any extra expenses in this connection. The Charterers and/or their Supercargo(es) may install and remove at their expense, such instruments as may be required to check the vessel's speed and revolutions of the main engines.

The Charterers and/or their Supercargo(es) shall have free and unlimited access to the whole vessel including bridge, holds and engine room, and also to all vessel's tanks, including but not limited to bunker lubricating oil, sludge, ballast and fresh water tanks.

**CLAUSE 44:      PERFORMANCE**

When assessing the performance of the vessel in relation to the speed(s) and consumption(s) detailed in Description Clause, good weather conditions is taken to mean up to Beaufort Wind Scale Force 4 and/or Douglas Sea State 3.

**CLAUSE 45:      STEVEDORE DAMAGES**

Should damage be caused to the vessel or her fittings by the Charterers or the stevedores the Master and/or the Owners shall:

1.)   Give written notice to the party allegedly responsible and to the Charterers or their Supercargo giving full particulars of the damage and its alleged cause the Master shall try to obtain the written acknowledgement of liability from the party causing any damage or failing this, shall try to obtain written acknowledgement from such party of receipt of this notice.

Any notice issued hereunder to be given no later than twenty four (24) hours after the alleged damage occurred or prior to the vessel's sailing from the port, whichever is sooner.

7

ORIGINAL

**RIDER TO**
**MV "CHERKASSY"**                    EKKO CHARTERING LLC
**CHARTER PARTY DATED OCTOBER 22, 2002**

2)    Immediately arrange in conjunction with Charterers agents or Supercargo for the damage to be surveyed and an estimate of the repair costs to be given. Master to arrange the survey on behalf and for account of Charterers.

If the Charterers would otherwise have been responsible for damage being caused to the vessel or her fittings they shall be exempted from such responsibility if the Owners or the Master has failed to comply with their obligations under this Clause.

In any event the Charterers shall not be held responsible for damages covered under the Owner's Hull and Machinery insurance.

In case of any and all damage(s) affecting the vessel's seaworthiness and/or the safety of the crew and/or affecting the trading capabilities of the vessel, the Charterers shall immediately arrange for repairs of such damage(s) at their expense and the vessel is to remain on hire until such repairs are completed and if required passed by the vessel's classification society.

**CLAUSE 46:    OFF-HIRE**

After suspension of hire from any cause, the vessel shall be placed at Charterers disposal at the same port or same or equivalent position where hire was suspended.  Charterers may, however, in their option accept the vessel on hire again in such position and at such time as the vessel may again in all respects be ready to comply with the orders and directions of the Charterers.

The Charterers may in their option, at any time, add to the Time Charter period partly or wholly any off-hire period(s).  The rate of hire for any such added period(s) shall be paid at the same rate as that applicable during the off-hire period(s).

During any off-hire period estimated to exceed eight (8) days the Owners to give the Charterers not less than five (5) days definite notice of resumption of the service.

If the vessel has been off-hire for a period of thirty (30) consecutive days during this Charter Party, the Charterers are at liberty to cancel the balance period of this Charter Party and redelivery shall take place upon vessel being free of cargo.

8

*ORIGINAL*

**RIDER TO**
**MV "CHERKASSY"**                    EKKO CHARTERING LLC
**CHARTER PARTY DATED OCTOBER 22, 2002**

**CLAUSE 47:    PUNCTUAL PAYMENT – BREACH OF CHARTER**

With reference to Clause 5, it is agreed that the hire is to be considered correctly paid upon Charterers instructing their bankers to irrevocably remit the hire to Owners as stated in Clause 54.

Before exercising the option of withdrawing the vessel from the Charter, the Owners will give, the Charterers forty-eight (48) hours (Saturdays, Sundays and holidays excluded) official notice in writing and will not withdraw the vessel if the hire is paid or the alleged breach is rectified within the forty eight (48) hours allowed for notice from the time the Charterers received such notice.

The Charterers have the liberty to retain sufficient funds from any hire to cover actual and estimated amounts including estimated off-hire and value of estimated bunkers on redelivery for Owners' account.

**CLAUSE 48:    ARBITRATION**

All disputes arising out of this contract which cannot be amicably resolved shall be referred to arbitration in London.

Unless the parties agree upon a sole arbitrator the reference shall be to two (2) arbitrators, one to be appointed by each of the parties. The arbitrators shall be commercial men and the umpire, if appointed, shall be a legal man and shall be members of the London Maritime Arbitrators Association or otherwise qualified by experience to deal with commercial shipping disputes.

The Contract is governed by English Law and there shall apply to arbitration proceedings under this Clause the terms of the London Maritime Arbitrators Association current at the time when the arbitration proceedings commenced.

It is further agreed that seven (7) days limit for appointment of the arbitrator either originally or by substitution shall be changed to thirty (30) days.

In the event the amount of claim and counter-calls does not exceed U.S. $50,000.00 the parties agree to refer to any dispute to a sole arbitrator in accordance with the LMAA small claims procedure 1989.

**CLAUSE 49:    SPEED**

The Charterers may instruct the vessel to steam at any speed within the capabilities of the vessel's main engine.

9

ORIGINAL

**RIDER TO**
**MV "CHERKASSY"**                    EKKO CHARTERING LLC
**CHARTER PARTY DATED OCTOBER 22, 2002**

With reference to lines 9 and 10 of this Charter Party, good weather conditions is understood to mean all weather conditions not exceeding wind force Beaufort 4 and Douglas state 3.

**CLAUSE 50:    IN LIEU OF CLEANING ON REDELIVERY**

Charterers have an option to redeliver the vessel with unclean holds and paying lumpsum amount of U.S. $3,000.00 in lieu of holds cleaning. Upon completion of each cargo, if requested by Charterers, vessel's crew to clean/prepare the holds in Charterers time and Charterers paying lumpsum amount of U.S. $500.00 per hold actually cleaned. If vessel fails holds inspection due to rust and/or scales and/or loose or peeling paint same shall be for Owners' account.

Owners/Master will endeavor to effect such cleaning as best as possible, but without guarantee that the cargo holds will be sufficiently cleaned and accepted on arrival at the loading port and the Owners shall not be responsible for any consequences arising from the fact that the crew has been employed in cleaning. Owners to maintain cargo hold/spaces and interior of hatch covers/coamings free of rust and scale for the duration of this Charter Party. If fails hold inspection due Owners not comply with above than Owners rectify same at their time/expenses and if there is any extra charge which is directly related for vessel failure such as dockage/launch boat, re-inspection fee etc. to be for Owners' account and same to be substantiated by vouchers.

**CLAUSE 51:    LAST VOYAGE**

Should the vessel, on her last voyage under this Charter Party be delayed and the maximum charter period thereby exceeded, the Charterers shall have the use of the vessel to enable them to complete the voyage. Hire for such excess period to continue at the rate stipulated in Clause 4.

**CLAUSE 52:**

Deleted.

**CLAUSE 53:    DESCRIPTION CLAUSE**

> **MV "CHERKASSY"** - EX " VASILIS KATSIKIS " LLOYD'S NO: 8306553
>
> VESSEL IS BULK CARRIER, CLASS RS KM L3
> GRT/NRT/DWT 16794/ 8843/ 23181 ON 10.21 SSW
> LOA/BEAM 176.61/22.91 SUEZ/PANAMA NRT 13244/11762
> GRAIN CAPACITY 29726; HO/HA 5/10; FLAG RUSSIAN;
> DEPTH MOULDED-14.0M
> TPI 87.5; BUILT FEBRUARY 1984; BUNKER CAPACITY: 1516/263 MT

ORIGINAL

**RIDER TO**
**MV "CHERKASSY"**                    **EKKO CHARTERING LLC**
**CHARTER PARTY DATED OCTOBER 22, 2002**

CONSTANTS: 350 MTS

HATCHES/HO L/B/H:
1 23.0/15.0/9.5 GR/B 3891/3813 L/B:13.6/2x7.45  (M)

2 25.3/19.5/12.0 6595/6463 19.5/2x8.95
3 24.7/19.5/12.0 6403/6275 19.5/2x8.95
4 24.7/19.5/12.0 6491/6361 19.5/2x8.95
5 24.7/12.0/12.0 6347/6219 19.5/2x8.95

CRANE CAPACITY: 4x25 MTS OUTREACH 24 M

SPEED/CONSUMPTION:
LAD 12.6/24.5 MT IFO 180/RME 25 + 3.1 MT MDO/DMC
BAL 13.4 24.5 MT IFO 180/RME 25 + 3.1 MT MDO/DMC
IN PORT WITH CGO OPS: 1.0 MT IFO180 + 2.7 MT MDO
W/OUT CGO OPS: 1.0 MT IFO180 + 1.4 MT MDO
FOR MANOUVERS:
735 KG/HR MDO + 5% GAS/DMA OF IFO CONSUMED FOR ENSURING
OF   WORKING   ME   WHILE   STARTING/STOPPING,   AND   FOR
EMERGENCY GEN

VESSEL HAS NO SHAFT GENERATOR INSTALLED.

**CLAUSE 54:**      **ADDITIONAL INFORMATION**
Banking details:

| | | |
|---|---|---|
| In favor of | : | FAR EASTERN SHIPPING CO. |
| | | 15 Aleutskaya Street |
| | | Vladivostok, Russia |
| | | |
| Account No | : | 407 028 409 000 600 100 07 |
| With | : | FAR EASTERN BANK |
| | | 27-A Verkhne-Portovaya Street |
| | | Vladivostok |
| | | |
| Swift Code | : | FAEBRU8V |
| Corresponding Account No | : | 890-0096-969 |
| With | : | BANK OF NEW YORK |
| | | One Wall Street |
| | | 9th floor |
| | | New York, NY 10286 |

11

ORIGINAL

**RIDER TO**
**MV "CHERKASSY"**
**CHARTER PARTY DATED OCTOBER 22, 2002**

EKKO CHARTERING LLC

| | | |
|---|---|---|
| ABA No | : | 021 000 018 |
| Swift Code | : | IRVTUS3N |

**CLAUSE 55:**
If at any time during the charter the vessel is ordered to load grain or any other commodity and is rejected by USDA and/or NCB inspectors (in Canada understood "Port Warden") or any other authorized inspector because of rust and/or rust scales, vessel to be placed off-hire until Owners effect at their expense the necessary work to obtain final passes. In this event Owners to clean immediately upon rejection of the vessel and with the utmost despatch.

**CLAUSE 56:**
All negotiations and eventual fixture to be kept private and confidential.

**CLAUSE 57:**
Bunkers on delivery money to be paid together with first charter hire.

**CLAUSE 58:**
Owners confirm vessel's holds/tank top to be clear of obstructions and suitable for grab discharge.

**CLAUSE 59:**
Deleted.

**CLAUSE 60:**
Owners have the right to sell the vessel during the currency of this Charter Party subject to Charterers approval which not to be unreasonably withheld.

**CLAUSE 61:**
Owners guarantee vessel on delivery to be clean/swept/washed down by freshwater and dried up, free of salt, loose rusts and scales and previous cargo residue. Furthermore Owners guarantee vessel on delivery to be grain clean (as per USA Regulation / Standards) and suitable to load grain/grain products/soy bean meals.  In case of vessel failing holds inspection, vessel to be off-hire until such time as all holds are fully passed inspection and if any related expenses as dockage, shifting and re-inspection cost to be for Owners' account.

ORIGINAL

# RIDER TO
## MV "CHERKASSY"
### CHARTER PARTY DATED OCTOBER 22, 2002

EKKO CHARTERING LLC

## CLAUSE 62:
Owners undertake the hatchcovers are and remain during the currency of this Charter Party to be weathertight.  Should any hatchcover be found to be not weathertight then vessel to be off-hire for the time lost to rectify the condition unless cargo operations continue in which case hire to be prorated in proportion to holds not watertight to holds working. Owners are liable for any direct expense incurred by way of hire and bunkers.  In the event of a dispute as to the condition of the hatches the class surveyor's findings to be final.

## CLAUSE 63:
Owners guarantee vessel is not blacklisted by trading countries due to vessel's flag/ownership.

## CLAUSE 64:
For the purpose of calculating Charter Party duration, delivery/redelivery is based on GMT.

## CLAUSE 65:
Deleted.

## CLAUSE 66:
In the event that multiple Bill(s) of Lading are used, Owners are responsible only for delivering the total quantity loaded and not the distribution of cargo to each individual receivers.

## CLAUSE 67:
Deleted.

## CLAUSE 68:    BIMCO STANDARD ISM CLAUSE
From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code.  Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided for in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the Owners' account.

13

RIDER TO
MV "CHERKASSY"    **EKKO CHARTERING LLC**
**CHARTER PARTY DATED OCTOBER 22, 2002**

ORIGINAL

## CLAUSE 69:
## BIMCO STANDARD YEAR 2000 CONFORMITY CLAUSE

"Year 2000 conformity" shall mean that neither performance nor functionality of computer systems, electronic and electromechanical or similar equipment will be affected by dates prior to or during the year 2000.

Without prejudice to their rights, obligations and defense under this Charter Party including where applicable, those of the Hague or Hague-Visby Rules, the Owners and the Charterers and in particular the Owners in respect of the Vessel, shall exercise due diligence in ensuring Year 2000 conformity in so far as this has a bearing on the performance of this Charter Party.

## CLAUSE 70:

In case of loading general cargo or steel Owners to provide their P&I surveyor to conduct a preloading survey cost of which to be for Owners' account.

## CLAUSE 71:

Owners guarantee that the vessel is free of Gypsy Moth eggs/larvae or any form of Gypsy Moth live prior to entering Charter Party thereby meeting all agricultural Canada/USDA Plant Protection Regulations.

## CLAUSE 72:    DOUBLE BANKING CLAUSE

Charterers have the right to load and/or discharge on double banking basis at loading and/or discharging port or place always subject to Master's satisfaction and any additional equipment/facilities such as fenders and mooring lines whenever considered necessary by the Master are to be supplied by the Charterers in their time and at their expense. If at any time during the operation, the Master considers it unsafe to continue due to adverse weather etc. he may order the other vessel and/or barge's away from his vessel or remove own vessel in order to avoid prejudicing the safety and his vessel. Any additional insurance premium has to be arranged and paid by the Charterers before the operation with the vessel's underwriters. All damages caused to the vessel or crew due to this operation will remain under Charterers responsibility and expenses.

14

ORIGINAL

**RIDER TO**
**MV "CHERKASSY"**                    EKKO CHARTERING LLC
**CHARTER PARTY DATED OCTOBER 22, 2002**

## CLAUSE 73:

Cables/victualling/entertainment     :     U.S. $800.00 per month pro
rata in cash to Master.
Cash to Master for every port of call :     U.S. $100.00 per every port of
call in cash to Master.

## CLAUSE 74:     SUBLETTING CLAUSE

The Charterers shall have the option of subletting the vessel subject to
the Owners prior approval which shall not be unreasonably withheld,
upon giving notice in writing to the Owners, but original Charterers
always remain responsible to the Owners for due performance of the

Charter Party and contractors of person of company taking such
subletting shall be deemed contractors of the Charterers for all the
purposes of this Charter Party. Acceptance of redelivery by Charterers
shall not constitute any waiver of Charterers' rights hereunder.

## CLAUSE 75:     FUMIGATION CLAUSE

Charterers' option fumigate cargo in port with all costs of same to be for
Charterers' account and fumigation to be performed in Charterers time
and at their risk. Fumigation is not to take place whilst crew are aboard
vessel, and all costs ashore including accommodation, meals, transport
for crew to be for Charterers' account.

---

**This Charter Party is subject to the following clauses all of which are
also to be included in all bills of lading or waybills issued hereunder:**

(a) CLAUSE PARAMOUNT
"This bill of lading shall have effect subject to the provisions of the
carriage of Goods by Sea Act of the United States, the Hague Rules, or
the Hague-Visby Rules, as applicable, or such other similar national
legislation as may mandatorily apply by virtue of origin or destination of
the bills of lading, which shall be deemed to be incorporated herein and
nothing herein contained shall be deemed a surrender by the carrier of
any of its rights or immunities or an increase of any of its responsibilities
or liabilities under said applicable Act. If any term of this bill of lading be
repugnant to said applicable Act to any extent, such term shall be void to
that extent, but no further."

15

ORIGINAL

**RIDER TO
MV "CHERKASSY"
CHARTER PARTY DATED OCTOBER 22, 2002**

**EKKO CHARTERING LLC**

(b) BOTH-TO-BLAME COLLISION CLAUSE

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact."

(c) NEW JASON CLAUSE

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general verage nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery."

16

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------X
 DICALITE ARMENIA, INC.,
                    Plaintiff(s),

        -against-

PROGRESS BULK CARRIERS, LTD.,
                    Defendant(s).
-------------------------------------------------X
STATE OF NEW YORK    )
                                    S.S.:
COUNTY OF NEW YORK)

JUDGE PAULEY
Index No. 07 CIV 8660

AFFIDAVIT OF SERVICE

          NELSON CARVAJAL, being duly sworn, deposes and says that he is over the age of

eighteen years, is employed by the attorney service, DLS, INC., and is not a party to this action.

          That on the 9th day of October 2007, at approximately 3:40 p.m., deponent served a true

copy of the **SUMMONS IN A CIVIL ACTION, CIVIL COVER SHEET, NOTICE OF PETITION TO**

**CONFIRM ARBITRATION AWARD AND TO ENTER JUDGMENT, PETITION TO CONFIRM**

**ARBITRATION AWARD AND TO ENTER JUDGMENT, ORDER, MEMORANDUM OF LAW IN**

**SUPPORT OF PETITION TO CONFIRM ARBITRATION AWARD AND TO ENTER JUDGMENT,**

**AFFIDAVIT OF BARRY KATZ IN SUPPORT OF PETITION TO CONFIRM ARBITRATION AWARD**

**AND TO ENTER JUDGMENT AND DISCLOSURE STATEMENT OF DICALITE ARMENIA, INC.**  upon

Progressive Bulk Carriers, Ltd. c/o Med Brokerage and Management at 29 Continental Place, Glen Cove,

NY 11542, by personally delivering and leaving the same with Arif Ors, Manager, who informed deponent

that he is an agent authorized by appointment to receive service at that address.

          Arif Ors is a Israeli male, approximately 40 years of age, stands approximately 5 feet 8

inches tall and weighs approximately 185 pounds with black hair and brown eyes.

_____
NELSON CARVAJAL #965441

Sworn to before me this
10th day of October, 2007

_____
NOTARY PUBLIC

JONATHAN T. RIPPS
Notary Public, State of New York
NO. 01RI6109718
Qualified in Rockland County
Certificate Filed in New York County
Commission Expires May 17, 20_08_